[Cite as *Cornell v. Mississippi Lime Co.*, 2017-Ohio-7160.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| JERRY CORNELL | ) | CASE NO. 16 CO 0005 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| MISSISSIPPI LIME COMPANY, et al. | ) | |
| | ) | |
| DEFENDANTS-APPELLEES | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from the Court of Common Pleas of Columbiana County, Ohio Case No. 13 CV 597

JUDGMENT:    Affirmed.

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  August 7, 2017

[Cite as *Cornell v. Mississippi Lime Co.*, 2017-Ohio-7160.]
APPEARANCES:

For Plaintiff-Appellant, Jerry Cornell:

Atty. Neal E. Shapero
Atty. Abby L. Botnick
Atty. Andrew Thompson
Shapero & Roloff Co., LPA
1350 Euclid Avenue, Suite 1550
Cleveland, Ohio  44115

Atty. Jeffrey Bruzzese
100 N. 4th Street, #300
Steubenville, Ohio  43952


For Defendant-Appellee,
Mississippi Lime Co.:

Atty. Lawrence A. Sutter
Atty. Daniel A. Leister
Atty. Sutter O'Connell
1301 East 9th Street
3600 Erieview Tower
Cleveland, Ohio 44114


For Defendant-Appellee,
Wellsville Terminal Co.:

Atty. Paul D. Eklund
Atty. Deanna K. Richards
Collins, Roche, Utley & Garner, LLC
800 Westpoint Parkway
Suite 1100
Cleveland, Ohio  44145

WAITE, J.

{¶1} Appellant Jerry Cornell appeals the February 18, 2016 judgment entry of the Columbiana County Court of Common Pleas granting summary in favor of Appellees Mississippi Lime Company ("plant owner") and Wellsville Terminal Company ("employer") in this negligence and employer intentional tort action. For the following reasons, the judgment of the trial court is affirmed.

Facts

{¶2} This case arises from serious workplace injuries suffered by Appellant on August 29, 2012 at a lime plant, when he was swept to the ground by a slurry consisting of thousands of gallons of scalding water and lime rushing from the drain of a lime hopper. Appellant suffered second and third degree burns over 68% of his body.

{¶3} Appellant sued both plant owner and his employer after this incident. Appellant asserts that plant owner was negligent because it was responsible for the maintenance of the lime hopper and conveyor system. It knew the hopper was in a state of disrepair and prone to clog with lime and knew that employer was using an unsafe method to clear these clogs, which was to dump thousands of gallons of river water into the hopper. Appellant contends that his employer committed an intentional tort because it is presumed to have acted with intent to injure pursuant to R.C. 2745.01(C) where it knowingly misrepresented the nature of a hazardous chemical.

{¶4} Employer owns a terminal along the Ohio River. Plant owner is a large lime company headquartered in Missouri. For several decades plant owner has leased a portion of employer's land. Plant owner has placed its own equipment for

unloading and storing lime, including the lime hopper and conveyor at issue in this case, on employer's property ("lime plant"). Plant owner transfers lime to the lime plant by barge, where employer unloads it into the hopper, onto a conveyor, and into silos where it is later transferred out via rail or truck.

{¶5} The land lease agreement ("lease") in effect between plant owner and employer at the time of Appellant's accident provides that plant owner will use and occupy the lease premises in a careful, safe, and proper manner and will conform to and obey all present and future laws, ordinances, rules, regulations, requirements and orders of the United States of America, the State of Ohio, and the Village of Wellsville, and of all governmental authorities or agencies.

{¶6} Plant owner and employer also entered into an Independent Contractor Agreement ("agreement") under which employer agreed to provide all labor and services necessary to receive and unload plant owner's lime from the barges, transfer the lime for storage, and eventually load the lime into rail cars and trucks for delivery. Under the terms of this agreement, plant owner maintained control over the equipment used in the facility, was allowed reasonable access to the terminal facilities, and was required to repair or replace, at its own expense, the conveyance equipment and storage bins if they became worn out, broken, or otherwise unfit for use during the term of the agreement. The agreement was in effect at all times relevant to this case.

{¶7} There was no lid on the hopper when it was not in use, so the lime deposited in the hopper was exposed to rain and snow. According to the testimony

of Jay Muse, one of the owners of employer, there once had been a lid on the hopper but it inexplicably disappeared. (J. Muse Depo., pp. 19-22.) When residual lime in the hopper got wet, it became thick and built up inside the equipment. Mechanical vibrators on the side of the hopper, designed to vibrate loose particles of lime to the bottom, were frequently inoperable. A shaker table, which was to evenly distribute lime onto the conveyor belt, did not function.

{¶8} Appellant complained to his supervisor, Craig Homic, about the condition of the equipment. (Cornell Depo., p. 66.) Homic testified that "everybody knew that [the lime plant] was a piece of shit." (Homic Depo., p. 190.) However, Jeff Fultz, a crane operator and union representative, testified that he had never received a grievance regarding safety from any employee. (Fultz Depo., p. 37.)

{¶9} Lime frequently clogged the hopper. Employees removed clogs by dropping crane buckets full of thousands of gallons of river water into the top of the hopper, flushing the clogged lime out of the drain at the bottom of the hopper. Homic was taught to clear clogs in the lime hopper in this manner when he was employed as a superintendent, and he instructed Appellant to clear clogs the same way when Appellant became foreman. (Homic Depo., pp. 79-80.)

{¶10} Employees did not commonly wear personal protective equipment ("PPE") when flushing the hopper, only when working directly with lime. (Cornell Depo., p. 25; Fultz Depo., p. 97.) Homic testified that the process was safe as long as proper precautions were taken; that is, when employees maintained a safe distance from the hopper during a flush. In fact, prior to Appellant, no employee was

ever injured during the flushing process. (Homic Depo., pp. 97-98, 161-162, 174-176.)

{¶11} Fultz testified that employees, including Appellant, occasionally stood at the base of the hopper and used the high-pressure hose to unclog the drain, but this was only when the hopper was empty. No employee ever used the high-pressure hose when the hopper contained a crane bucket of river water. (Fultz Depo., pp. 43-44, 80.)

{¶12} Lime is a hazardous material. When exposed to water, it creates an exothermic reaction, giving off enough heat to create steam. The lime reacts with the water to form calcium hydroxide. The crane bucket is estimated to hold about eighteen cubic yards. One cubic yard is equivalent to about 200 gallons of water. Plant owner had prepared Material Safety Data Sheets ("MSDS") for its lime, however Homic could not recall whether plant owner provided them to employer. *Id.* at 86-87.

{¶13} Every month, plant owner paid employer between $500.00 and $3,500.00 for plant maintenance. According to Homic, employees were responsible for routine maintenance, which included cleaning and greasing the equipment, and tightening belts. *Id.* at 43, 188-189. Any equipment repair had to be authorized or approved by plant owner. If problems arose with the equipment, the issues were reported to Homic, who notified plant owner. Homic typically dealt with Jeff Corrie, plant owner's Traffic Manager.

**{¶14}** Homic testified that he advised Corrie years before Appellant's accident of the condition of the lime hopper and clogging problem, and he also told Corrie about the method used for clearing out clogs. *Id.* at 57-58. While Corrie did not recall being told about the flushing procedure, he conceded that it created a dangerous situation. (Corrie Depo., p. 51.) For purposes of summary judgment, we must assume plant owner was aware of the condition of the lime plant, the clogging problem, and the flushing procedure used to unclog the hopper.

**{¶15}** Richard Donovan, plant owner's Safety and Health Manager, stated that he would not condone such a procedure, and that it does not follow plant owner's guidelines for safe use of handling lime. (Donovan Depo., p. 34.) Jeff Dahl, plant owner's Director of Mid-East Operations, testified that the process of clearing the hopper should have not been undertaken by employees due to the potential hazards created by combining water and lime. (Dahl Depo., p. 28.)

**{¶16}** In 2001, plant owner's Safety Supervisor, Jeff Gurley, performed an inspection at the facility. Gurley noted numerous problems in the operation: employer did not have any formal training program for employees working at the lime plant; it did not undertake a hazard assessment on the use of PPE; and it was not in compliance with the Occupational Safety and Health Administration ("OSHA") regulations pertaining to a hazard communication program, making MSDS sheets available to employees, and training for employees that handled hazardous substances. (Gurley Depo., Exh. 2.)

**{¶17}** Gurley admitted that his findings were troubling, particularly because the problems he identified could lead to employee injuries. (Gurley Depo., p. 41.) Gurley verbally informed employer's management of his findings at the time of his visit and later drafted a report, a copy of which was provided to employer as well as Gurley's plant owner supervisors. *Id.* No action was taken to address the deficiencies in the operation.

**{¶18}** Somewhere between 2006 and 2008, plant owner sent Corrie and VP of Sales, William Ayers, to the facility. Ayers was overheard telling Corrie that plant owner would not be putting more money into the facility. (Charles Muse Depo., pp. 26-27.) Homic heard them remark that there was not enough revenue generated through the facility to warrant any additional investment. (Homic Depo., pp. 67-70.)

**{¶19}** Appellant was hired as a foreman in 2006. Appellant had a GED and no previous supervisory experience. He was not given any technical training in safety or the safe handling of lime. Nevertheless, he was charged with overseeing the terminal operation and was responsible for training employees (crane operators and laborers), in the proper use of PPE. Appellant was likewise responsible for enforcing safety rules and overseeing employees to ensure that jobs were performed in a safe manner.

**{¶20}** Homic was Appellant's immediate supervisor and was primarily responsible for keeping the terminal operational. Homic, too, had only a GED. Like Appellant, he had no training specific to hazardous materials or workplace safety.

**{¶21}** Employees were trained and instructed to wear PPE when working around lime. This included wearing a hardhat, chemical resistant gloves, safety glasses, a Tyvek suit, and a respirator mask and filter. (Cornell Depo., pp. 41-44; Homic Depo., pp. 156, 177; Fultz Depo., pp. 31-33.) Appellant was specifically charged with the duties of not only training the employees on the proper use of PPE, but also in ensuring that employees were wearing their PPE when required. (Fultz Depo., p. 128.) Employees were required to acknowledge safety guidelines set forth in an employee handbook. Appellant had executed an acknowledgement of the safety guidelines prior to the accident. (Cornell Depo., p. 60.)

**{¶22}** Warning signs were posted in and around the lime plant advising that the plant contains hazardous chemicals. Appellant testified that, prior to his accident, he had been specifically instructed that PPE was required when working with lime because lime would cause skin burns if exposed to moisture, such as the sweat on skin. (Cornell Depo., pp. 45-49, 137.) Despite the lack of technical training, Appellant testified that prior to his accident, he was aware that if lime contacted his skin, it would burn his flesh:

Q. Who was it that told you you were supposed to wear the suits and the gloves when you're directly around lime?

Well I think direct -- when we're working in lime. Craig, when we're working in lime, everybody, when you're working in lime, you wear the suits when you [sic] working in lime. It's well-known, you're working in lime, you wear the suits when you're working in lime. If you're not

working in lime, it wouldn't make no sense to wear a suit. I mean, that would be common sense.

(Cornell Depo., p. 45.)

{¶23} Appellant testified further that:

Q. When you're working in the lime, why would people wear suits if you're working in the lime?

A. Because they got burnt when they were in the lime.

Q: Do I understand from that then that you knew that lime was a substance that could burn you?

A. And they didn't even get burnt when they were in the lime unless it was wet.

Q. Okay, let me back up, I asked you a different question. My question was -- and let me back up.

You indicated to me that people, when they work in the lime, wear the gloves and wear the suits, correct?

A. When they were working in the lime, correct.

Q: Right. And the reason that they wear the gloves and the suits when they work in the lime is because the lime can burn you if the lime was exposed to water?

A. Yes, or sweat.

Q. Or sweat.

A. Sweat, yes.

Q.  Any kind of moisture?

A.  Yes, correct.

Q.   And that's something you knew way back in 2006 when you started?

A.  Correct.

*Id.* at 49-50.

{¶24}  Later in his deposition, Appellant continued:

Q.  You did learn, however, from the time that you started at Wellsville Terminal up to the time of the accident, you had learned that lime and water causes heat and can cause burns?

A.  Correct.

* * *

Q.  And nobody tried to tell you the lime wasn't going to burn people if it hit water, correct?

A.  Correct.

Q.  Nobody ever hid that fact from you?

A.  Yeah, true.

* * *

Q.  Did other employees tell you that lime and water don't mix?

A.  That's no.  We know.

Q.  You knew that?

A.  I knew that, yeah, I know that.

Q. And nobody told you anything differently?

A. True.

*Id.* at 136-137.

{¶25} When the lime hopper became clogged, employer required that employees stand well away from it while a crane operator dumped a bucket of water into the hopper to flush it out. (Cornell Depo., pp. 153-154; Fultz Depo., p. 40; Homic Depo., p. 78.) Additional buckets of water were added, if needed, until the clog cleared. (Homic Depo., pp. 80-81, Foltz Depo., p. 42.) Homic testified that he had emptied six to eight crane buckets of river water into the hopper to remove previous clogs. (Homic Depo., p. 87.) Employees were instructed to wait until the clog was cleared before returning to the lime hopper. (Fultz Depo., p. 61.)

{¶26} Two days before the incident, a barge containing lime was partially unloaded, but the operation was suspended due to a heavy rain. After the rain subsided, Appellant ordered laborers to prepare the lime plant in order to finish unloading the barge.

{¶27} Jim Shaw, a laborer, used a hose to clear the excess lime stuck on the shaker table that had accumulated because the shaker table did not function properly. Fultz called Appellant and told him that there was a significant amount of lime left in the hopper from the attempts to unload the barge two days earlier.

{¶28} Appellant called Homic and advised him that there was a considerable amount of lime in the hopper. Appellant told Homic that the only way he knew to

clear the lime was to flush it with river water. (Cornell Depo., p. 145.) Homic replied, "[d]o whatever you got to do to get that running." *Id.*

{¶29} Because the hopper lid was missing, the lime had been exposed to rain over several days. Appellant admitted that he stood in a position level with the top of the hopper, but well clear of the opening, because he was aware of the possibility of injury. *Id.* at 153. Per employer's practice, Fultz loaded river water into the crane bucket and dropped the water into the top of the hopper.

{¶30} Appellant looked into the hopper and saw steam, which he described as "bad" and "a mess." *Id.* at 154. Appellant conceded that he knew that a heat reaction was occurring, and that "[i]t's a dangerous situation." *Id.* He also stated that he was "panicking" when he learned that the clog had not been cleared. *Id.* at 158.

{¶31} Appellant then walked over to the base of the hopper and lifted the lid of the inspection box which allowed him to see the clog. Appellant testified that the quicklime clogging the opening looked like "cake batter." *Id.* at 157. Appellant did not see any water or quicklime coming though the drain at the bottom of the hopper.

{¶32} Appellant quickly put down the inspection box lid and moved away from the hopper. *Id.* at 158. Appellant testified, "* * * I hurried up and got out of there, because I knew get out there, you know. * * * Because something could happen, yeah, because I didn't want to be there to begin with, you know, whoa." *Id.*

{¶33} Rather than dumping a second crane bucket of water into the hopper pursuant to employer's usual procedure, and rather than waiting until the clog cleared before approaching the hopper or calling Homic for further instructions, Appellant

stood near the base of the hopper, picked up a nearby high-pressure hose, and started spraying water up at the clog in the drain at the base of the hopper. Appellant testified, "[t]he only thing I could do to think to get it out of there was pick up that hose and start trying to blast it, blasted that cake batter to try to get a wee little hole knocked in it to try to get it to flow, so I start blasting." *Id.* at 159.

**{¶34}** Fultz exited the crane and walked to where he could see Appellant. Fultz testified that he saw the chemical reaction, which produced about ten feet of steam. He told Appellant to move away from the drain of the hopper. Appellant responded, "I know. I know." (Fultz Depo., p. 121.) However, Appellant remained in the same location, moving only a few steps away from his original spot. Fultz testified that he was thinking "this ain't good, this ain't good," when the clog broke loose. *Id.* at 122.

**{¶35}** Appellant provided similar testimony:

I'm breaking a little bit loose. By the time I start breaking it loose, it dawns on me, Jeff starts screaming at me, get out of there, at the same time I start thinking it the same time, get out of there, too, because this might not be safe, at the same time we both start thinking it, I start backing loose [sic], but by that time it was too late, it broke loose.

(Cornell Depo., p. 162.)

**{¶36}** When the clog broke, Appellant heard a "woosh" and was swept off his feet by a stream of steaming water and quicklime. Fultz quickly obtained and poured vinegar on Appellant, sprayed him down with water, and removed his clothing.

Because Appellant was badly burned, emergency services were contacted and he was sent by life flight to West Penn Hospital Burn Center in Pittsburgh.

{¶37} Neither Appellant nor any other employee was ever trained or instructed to use a hose to spray water at a clog in the hopper when the hopper contained a crane bucket of river water. (Homic Depo., pp. 81-83; Fultz. Depo., p. 80.) In fact, Homic explained at deposition that this process was in violation of safety protocols and that anyone caught using this method to clear the hopper would have been immediately terminated from employment. (Homic Depo., p. 176.) Moreover, despite his awareness of the danger posed by wet lime, Appellant decided to spray water at the clog without first donning PPE. (Cornell Depo., p. 158.)

{¶38} As a result of Appellant's injuries, he spent weeks in a medically-induced coma at the West Penn Burn unit while he underwent numerous skin grafts. He is permanently disabled from his extensive burns, loss of touch and sensation, inability to regulate his body temperature due to the loss of his ability to sweat in the areas of his skin grafting, and respiratory injuries from inhaling the lime mixture. He has also dealt with significant and ongoing post-traumatic stress disorder and chronic depression, which by itself has been debilitating.

{¶39} After the incident, OSHA conducted an inspection of the facility. Employer was cited for a lengthy list of serious safety violations, including: failure to assess the workplace for the necessity of personal protective equipment; the lack of a workplace hazard assessment for the process of clearing clogs in the hopper with water; the failure to develop, implement, and/or maintain at the workplace a written

hazard communication program for employees working with lime; the failure to ensure that containers, including the hopper, were labeled, tagged or marked with the identity of hazardous materials contained therein; the failure to ensure that MSDS sheets for lime were made readily available to employees; the failure to inform employees of the hazards of lime, or the special precautions to be taken when water was added to the material when clearing a clog; the failure to train supervisors in accident prevention; and the failure to ensure that employees exposed to lime while clearing the hopper were using personal protective equipment. (11/17/15 Plaintiff's Opposition to Defendant, Wellsville Terminal Company's Motion for Summary Judgment, Exh. O, numbered 16-23.)

**{¶40}** After the accident, plant owner provided comprehensive safety training to employees, including information about the safe handling of lime. The training was implemented pursuant to policies plant owner had used in other locations prior to Appellant's accident. After Appellant's accident, employees were instructed not to use water to clear the equipment in the event of a clog and were told to contact an outside contractor to professionally clean the equipment, instead.

**{¶41}** John Carson, Ph.D., a mechanical engineer with approximately 40 years of experience consulting in the storage, flow and processing of bulk solids such as lime, was retained by Appellant to review the evidence in this case and prepare a report. With respect to plant owner, he identified several failures that contributed to the frequent clogging of the hopper, including rust and dents along the walls of the hopper, the lack of a lid or other covering, and lack of maintenance of the hopper

vibrator and shaker table functions. However, he conceded at his deposition that a well-maintained, fully-functioning hopper with a lid could nevertheless become clogged with lime. (Carson Depo., pp. 66-71.)

**{¶42}** Dr. Carson opined that plant owner knowingly permitted a hazardous condition to exist, and had Appellant perform a dangerous job that plant owner knew was substantially certain to cause injury. Dr. Carson also concluded that employer failed to ensure that its employees were properly trained on the hazards associated with handling lime, particularly when it ordered them to mix the lime with water.

**{¶43}** Appellant advances three assignments of error on appeal.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE MISSISSIPPI LIME COMPANY'S MOTION FOR SUMMARY JUDGMENT.

<u>ASSIGNMENT OF ERROR NO. 2</u>

THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE WELLSVILLE TERMINAL COMPANY'S MOTION FOR SUMMARY JUDGMENT.

<u>ASSIGNMENT OF ERROR NO. 3</u>

THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE MISSISSIPPI LIME COMPANY'S MOTION FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGES, WHICH IS A JURY QUESTION.

Summary Judgment

**{¶44}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

**{¶45}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some

evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.,* 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

**{¶46}** The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

<u>Plant Owner's Negligence</u>

**{¶47}** Appellant argues that a combination of four factors establishes plant owner's common law premises liability and its statutory liability pursuant to R.C. 4101.11 ("frequenter statute"): (1) its ownership of the equipment; (2) its contractual duty to maintain and repair the equipment; (3) its knowledge of employer's dangerous method of flushing the hopper; and (4) the foreseeability of Appellant's injuries. However, the trial court concluded that plant owner owed no duty of care to Appellant.

**{¶48}** It is important to note that the statutory duty owed to frequenters "is no more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which he has knowledge." *Eicher*

*v. United States Steel Corp.*, 32 Ohio St.3d 248, 249, 512 N.E.2d 1165 (1987). Therefore, a separate analysis under the frequenter statute is unnecessary.

**{¶49}** To establish actionable common law negligence, a plaintiff must show the existence of a duty, breach of that duty, and that an injury occurred that was the proximate result of that breach. *Di Gildo v. Caponi*, 18 Ohio St.2d 125, 247 N.E.2d 732 (1969). The existence of a duty in a negligence action is a question of law for the court to determine. *Railroad Co. v. Harvey*, 77 Ohio St. 235, 240, 83 N.E. 66 (1907).

**{¶50}** A defendant's duty to a plaintiff depends on the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. *Huston v. Konieczny*, 52 Ohio St.3d 214, 217, 556 N.E.2d 505 (1990). "Injury is foreseeable if a defendant knew or should have known that his act was likely to result in harm to someone." *Id.*

**{¶51}** "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). "It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone." *Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 39, 90 N.E.2d 859 (1950).

**{¶52}** The rule of proximate cause " 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such

consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.' " *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143, 539 N.E.2d 614 (1989). "In determining whether an intervening cause 'breaks the causal connection between [breach of duty] and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the [breach]." *Mussivand v. David*, 45 Ohio St.3d 314, 321, 544 N.E.2d 265 (1989).

{¶53} Premises tort claims where the alleged negligence arises from static or passive conditions, such as preexisting latent defects, are legally distinct from claims alleging active negligence by some act or omission. The distinction between static and active forms of negligence is legally significant, because it directly relates to the two separate and distinct duties an occupier owes its business invitees: (1) static conditions are tied to the owner's duty to maintain its premises in a reasonably safe condition, including the obligation to warn invitees of latent or hidden dangers, while (2) active negligence concerns the owner's duty not to injure its invitees by negligent activities conducted on the premises. *Perry v. Eastgreen Realty Co.,* 53 Ohio St.2d 51, 52, 372 N.E.2d 335 (1978)*.*

{¶54} Appellant contends he is raising an active negligence claim. However, Appellant bases plant owner's alleged duty on its ownership of the hopper and its failure to maintain the hopper, as well as its failure to warn employees of the dangerous properties of lime. In actuality, then, Appellant's negligence claim dealing

with the equipment states a claim for static negligence. His claim is not based on the activities taking place but on the state of the premises being used for the activity.

### *Wellman* Exception

**{¶55}** Appellant concedes that his employer is an independent contractor of plant owner. This should serve to exempt plant owner from liability. Under the common law of negligence:

> Where an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor.

*Wellman v. East Ohio Gas Co.,* 160 Ohio St. 103, 113 N.E.2d 629 (1953), paragraph one of the syllabus.

**{¶56}** An exception to this rule exists where the owner "actively participates" in the project assigned to the independent contractor, or controls a critical variable in the work environment. *Sopkovich v. Ohio Edison Co.,* 81 Ohio St.3d 628, 642-643, 693 N.E.2d 233 (1988). For purposes of establishing liability to the injured employee of an independent contractor, active participation means that the owner "directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project." (Emphasis deleted.) *Id.* at 641. An owner or general contractor does not actively participate merely by virtue of its supervisory

capacity, or where it imposes general safety requirements directed to all workers. *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110, 113, 488 N.E.2d 189 (1986), syllabus.

**{¶57}** It is Appellant's contention that plant owner was an active participant in the project because it was responsible for maintenance and repair of the hopper. Appellant also contends that plant owner permitted the unsafe manner of flushing the hopper because plant owner was aware of the practice and did nothing to prevent it.

**{¶58}** Contrary to Appellant's assertion, this record reveals that plant owner did not actively participate in the lime processing. Although plant owner had a right to inspect the premises, there is no evidence that it exercised any authority over the process. Plant owner made safety recommendations after Corrie's visit in 2001, however, plant owner did not reserve any right to control the process in either the lease or the independent contractor agreement.

**{¶59}** There is no question that plant owner did exercise some control over the lime plant. Again, in order for the exception to the rule that the owner is not responsible for injuries to employees of independent contractors to apply, that owner must "actively participate" in the work or control a crucial variable, pursuant to *Sopkovich*. In *Sopkovich*, the Ohio Supreme Court found that Ohio Edison owed a duty to an employee of an independent contractor who had been burned by contact with high voltage electricity. This decision was based on the fact that Ohio Edison retained and exercised exclusive control over a critical variable in the working

environment: the de-activation of specific electrical conductors in the work area. *Id.* at 643, 693 N.E.2d 233.

**{¶60}** The facts of this case are plainly distinguishable from the facts in *Sopkovich.* While it is true that plant owner had allowed the lime plant to fall into disrepair, Appellant's expert, Dr. Carson, conceded that defects in the hopper were not responsible for the lime clogs. According to Dr. Carson's testimony, a well-maintained, fully-functioning hopper with a lid could nevertheless become clogged with lime.

**{¶61}** Moreover, "[t]he law requiring an owner to keep the place reasonably safe for a contractor and his subcontractors does not apply where the work itself is of an unsafe nature or the defects are due to the imperfect and negligent work of the contractor himself." *Bosjnak v. Superior Sheet Steel Co.,* 145 Ohio St. 538, 543, 62 N.E.2d 305 (1945).

**{¶62}** Appellant is also mistaken in his belief that this matter does not involve an inherently dangerous activity. As this record clearly shows, transporting lime is an activity where there certainly are elements of real or potential danger. In *Salanki v. Doug Freshwater Contr., Inc.*, 7th Dist. 06-JE-39, 2007-Ohio-6703, ¶ 49, we adopted the following test to determine whether an activity is inherently dangerous:

> [T]he performance of a task is inherently dangerous when the
> independent contractor recognizes or should recognize that a degree of
> danger surrounds the performance of the task for which he was
> engaged. In answering the foregoing question, courts should not limit

the inquiry to the specific task being performed. Rather, courts also should consider the environment in which the task is performed. The owner or occupier of the premises will not be liable for an injury resulting from a danger inherent in a task when the injury was reasonably foreseeable to the independent contractor, i.e., the independent contractor knows or appreciates that degree of danger that "surrounds" the task's performance.

**{¶63}** The transportation of lime requires the use of PPE, and employees at the lime plant have suffered chemical burns as a result of handling lime. Warning signs are posted at the site. Employer kept vinegar on site to treat burns. Obviously, the danger of chemical burns was reasonably foreseeable to employer in this case.

**{¶64}** As Dr. Carson conceded that a hopper with a lid and in perfect condition can still clog with lime, this record reveals that employer, in conjunction with Appellant, its employee, created the hazardous condition causing the injury in this case. Appellant instructed Foltz to fill the hopper with thousands of gallons of water, aware of the heat reaction that would occur. Appellant undertook to stand at the base of the hopper near the drain and blast water into the opening. Although representatives of plant owner may have been aware of employer's practice of flushing the hopper with river water, and that it created a dangerous situation, plant owner did not control the creation of that situation, employer did. We also note that the record shows employer tried to ameliorate the danger of the flushing procedure by requiring employees to stand clear of the hopper until the clog was cleared.

Homic's testimony, coupled with Appellant's own admissions, established that Appellant's actions were in contravention of workplace policy and would have been grounds for termination. Even if we were to assume plant owner had a duty to control employer's operation and stop the admittedly hazardous practice of flushing out lime clogs, Appellant's own actions went beyond the known practice.

**{¶65}** Accordingly, the trial court did not err in concluding that plant owner owed no duty of care to Appellant. This record reveals that employer was engaged in inherently dangerous work, plant owner was not an active participant in the process, and the negligent acts of employer, combined with the acts of its employee, created the dangerous situation that caused Appellant's injuries.

<u>Open and Obvious Hazard</u>

**{¶66}** Assuming *arguendo* that the actions of plant owner would trigger liability under the exceptions to *Wellman*, it still owed no duty of care to Appellant. In Ohio, courts use the common-law classifications of invitee, licensee, and trespasser in cases of premises liability to define the scope of the legal duty owed by a landowner. *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 315, 662 N.E.2d 287 (1996). "Invitees are persons who rightfully come upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner." *Id.*

**{¶67}** "It is the duty of the owner of the premises to exercise ordinary care and to protect the invitee by maintaining the premises in a safe condition." *Light v. Ohio Univ.*, 28 Ohio St.3d 66, 68, 502 N.E.2d 611 (1986). However, when "a danger is

open and obvious, a landowner owes no duty of care to individuals lawfully on the premises." *Armstrong v. Best Buy Co.*, Inc., 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, syllabus. As a result, the presence of an open and obvious danger "acts as a complete bar to any negligence claims." *Id.* at ¶ 5.

**{¶68}** The reasoning for this "is that the open and obvious nature of the hazard itself serves as a warning [and the owner] may reasonably expect that persons entering the premises will discover [the hazard] and take appropriate measures to protect themselves." *Simmers v. Bentley Constr. Co.,* 64 Ohio St.3d 642, 644, 597 N.E.2d 504 (1992). Whether a plaintiff actually had observed the open and obvious danger does not control. Instead, "the determinative issue is whether the condition is, under an objective standard, observable." *Trowbridge v. Franciscan Univ. of Steubenville*, 7th Dist. No.12 JE 33, 2013-Ohio-5770, ¶ 11.

**{¶69}** In this case, there is no dispute that the injury-causing hazard was the clogged lime hopper filled with a slurry made up of thousands of gallons of scalding water and lime. The plume of steam rising from the hopper was in plain sight, and Appellant conceded that he saw the steam and recognized the danger. Appellant did not need to have special education and training on the chemical properties of lime in order for the danger of this hopper, filled with thousands of gallons of steaming, hot liquid, to be open and obvious. Notwithstanding plant owner's failure to specifically train employer's employees on the dangerous properties of lime, both Foltz and Appellant conceded that they recognized the threat of injury created by the combination of water and lime at the time Appellant stood under the hopper and

began spraying its drain with water from the high pressure hose in order to dissolve the clog.

**{¶70}** A reasonably prudent person need only see that a condition exists, and recognize that encountering that condition carries a "potential for danger." See *Miller v. First International. Fid & Trust Bldg., Ltd*, 6th Dist. No. L-08-1187, 2009-Ohio-6677.

**{¶71}** We have held that awareness of a "general unsafe condition" satisfies the open and obvious doctrine. See *Salanki* at ¶ 75. Any reasonable person facing the same circumstances would have seen that the hopper was filled with steaming, hot liquid, and recognized that standing at the base of the hopper near the drain and attempting to dislodge the clog carried the potential for serious injury. Moreover, in this case, Appellant conceded that he was actually aware of the danger. Fultz warned Appellant of this potential for danger minutes before his injury, and Appellant responded, "I know. I know." but moved only a few steps from his original spot. Further, Appellant conceded that he recognized the danger but waited until it was too late to retreat. Accordingly, the trial court did not err in concluding that the danger was open and obvious and that plant owner owed Appellant no duty of care.

**{¶72}** Appellant failed to establish an essential element of his negligence claim: that a duty of care was owed to him by plant owner. Appellant was engaged in an inherently dangerous activity. The danger to Appellant was created by employer's procedure of clearing the hopper of clogs in conjunction with Appellant's independent decision to remove the clog with the high-pressure hose while standing at the base of the hopper filled with thousands of gallons of boiling slurry. The

danger was both objectively open and obvious. Accordingly, the trial court did not err in granting summary judgment in favor of plant owner in this matter, and Appellant's first assignment of error has no merit.

<u>Plant Owner's Punitive Damages</u>

**{¶73}** Appellant's third assignment of error involves arguments surrounding Appellant's request for punitive damages from plant owner. Because we have determined that the trial court was correct in granting summary judgment to plant owner, his argument regarding damages is moot.

<u>Employer Intentional Tort</u>

**{¶74}** Because Ohio has a fault-free system to provide relief to employees injured in the workplace through the Workman's Compensation Act, Ohio sets a high bar on further recovery from employer for workplace injury. Revised Code Section 2745.01, which defines employer intentional torts, provides in pertinent part that:

(A) In an action brought against an employer by an employee * * * for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

(B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

(C) Deliberate removal by an employer of an equipment safety guard or *deliberate misrepresentation of a toxic or hazardous substance* creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result. (Emphasis added.)

**{¶75}** Despite the "substantially certain" language in the statute, the Ohio Supreme Court has held that an employee can only recover damages when employer acts "with the specific intent to cause an injury." *Houdek v. ThyssenKrupp Materials NA., Inc.*, 134 Ohio St.3d 491, 2012-Ohio-5685, 983 N.E.2d 1153, ¶ 11.

**{¶76}** Appellant first argues that his employer's dangerous method for clearing lime clogs provides direct evidence of its intent to injure him. Appellant overlooks the requirement to provide evidence of *specific* intent to injure. The evidence of record establishes that employer engaged in negligent practices to clear clogs in the hopper, but ameliorated the danger to its employees by specifically prohibiting them from standing near the drain of the hopper during and after a flush. In fact, Homic testified that any employee who had engaged in the same conduct as Appellant would have been terminated by the company. While it is apparent that employer's negligence added a level of hazard in this already dangerous business, Appellant flouted the safety rules employer did have in place and undertook to create the actual hazard here. Accordingly, the trial court correctly concluded that Appellant

failed to demonstrate a genuine issue of material fact exists with respect to the essential element of deliberate intent to injure.

**{¶77}** Next, Appellant contends that a rebuttable presumption was established because employer deliberately misrepresented the danger of the exothermic reaction when it failed to provide any specific training or written information regarding the hazards associated with lime. Appellant concedes that there is no evidence of any deliberate misrepresentation by employer in the record, but relies on his interpretation of our decision in *Wineberry v. North Star Painting Co.*, 2012-Ohio-4212 (7th Dist.). In *Wineberry*, we held that the language found in R.C. 2745.01(C), "deliberate removal by the employer of an equipment safety guard," includes the failure to attach safety equipment provided by the manufacturer. *Id.* at ¶ 7. Appellant argues that a similar omission occurred in his case.

**{¶78}** Appellant contends that the failure of employer to provide training to its employees on the danger associated with the combination of water and lime, coupled with the dangerous flushing procedure, constitutes an omission similar to the failure to attach an equipment safety guard addressed in *Wineberry, supra*. Even a cursory reading of *Wineberry* reveals that it has no relevance to this matter. Appellant conceded at his deposition that despite the absence of specific safety training, he was aware of the danger created by the combination of water and lime. He admitted that he saw the large plume of steam and recognized the danger. In fact, Appellant admitted throughout his deposition that he was completely aware of the danger

inherent in working with lime, and more specifically, the particular risk created when water is combined with lime.

**{¶79}** Moreover, Appellant departed from employer's standards when flushing the hopper with water from the crane bucket. Instead of removing himself from the area of the hopper during this procedure, he chose to stand at the base of the hopper near the drain as he attempted to remove the clog from the underside. In his appellate brief, counsel argues that Appellant was reacting in an emergency because he feared that the entire plant would ignite if the hopper was not immediately cleared. However, Appellant did not testify to this concern at his deposition, and no affidavit was offered in support of this claim.

**{¶80}** Simply stated, Appellant has failed to offer any evidence that his employer specifically intended to injure him. By all accounts, employer engaged in a dangerous method for clearing the hopper of lime, but mitigated the danger by prohibiting employees from standing near the hopper during and after a flush. Appellant's injuries did not result directly from employer's method for unclogging the hopper. Instead, the record shows that Appellant was injured due to his own decision to attempt to clear the clog while standing at the base of the hopper near the drain, in contravention of employer's policy. Based on this record, the trial court did not err in granting summary judgment on the employer intentional tort claim, and Appellant's second assignment of error also has no merit.

### Conclusion

{¶81} Appellant's first and second assignments of error are meritless. Appellant's third assignment of error is moot. The judgment of the trial court granting summary judgment in favor of plant owner on the negligence claim and employer on employer intentional tort claim is affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs.